934 So.2d 1187 (2006)
Robin Lee ARCHER, Appellant,
v.
STATE of Florida, Appellee.
Robin Lee Archer, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-451, SC05-696.
Supreme Court of Florida.
June 29, 2006.
*1191 Sara K. Dyehouse, Esquire, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Robin Lee Archer, a prisoner under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Archer also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's denial of postconviction relief and deny the petition for habeas corpus relief.

I. BACKGROUND
In 1991, Robin Lee Archer was convicted of armed robbery, grand theft, and first-degree murder. Although Archer was not present when the crime occurred, he supplied the motivation and the inside information for the robbery of the Trout *1192 Auto Parts store and the murder of the store clerk, Billy Coker. Three other individuals were found responsible for the crime: Patrick Bonifay, who shot and killed Coker; Clifford Barth, who assisted Bonifay inside the store; and Larry Edwin Fordham, who drove the getaway car. On direct appeal, this Court summarized the facts of the crime as follows:
According to the testimony presented at trial, Archer was fired from his job at an auto parts store in March 1990. The following January he convinced his cousin, seventeen-year-old Pat Bonifay, to kill the clerk he apparently blamed for his having been fired. Bonifay testified that Archer told him to rob the store to hide the motive for the killing and to wear a ski mask and gloves and also told him the location of the store's cash box and emergency exit. Bonifay borrowed a handgun from a friend who gave the gun to Archer to give to Bonifay.
Bonifay talked two friends into helping him, and the trio went to the parts store on Friday night, January 24, 1991. Bonifay could not go through with the murder, however, and they left the store. The next day Archer got after Bonifay for not killing the clerk, and the trio went back to the store that night. Bonifay shot the clerk and he and one of his friends crawled into the store through the night parts window. After opening the cash boxes, Bonifay shot the clerk in the head twice as he lay on the floor begging for his life. Archer later refused to pay Bonifay because he killed the wrong clerk.
Bonifay confessed to several people, one of whom informed the authorities, resulting in the arrest of Archer, Bonifay, and Bonifay's two friends. The defendants were tried separately, and Archer's jury convicted him of first-degree murder. The judge agreed with the jury's recommendation and sentenced him to death.
Archer v. State, 613 So.2d 446, 447 (Fla. 1993).
This Court affirmed Archer's first-degree murder conviction but vacated his death sentence because the trial court improperly instructed the jury on the heinous, atrocious, or cruel aggravating factor. Id. at 448.
On remand after a new penalty phase, the jury recommended a death sentence by a seven-to-five vote. Finding two aggravating factors[1] and two mitigating factors,[2] the trial court followed the jury's recommendation and sentenced Archer to death. On direct appeal, this Court affirmed Archer's death sentence. Archer v. State, 673 So.2d 17 (Fla.1996).

II. RULE 3.850 APPEAL
On September 19, 1997, Archer moved for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850.[3] On January 8 and January 9, 2002, the postconviction *1193 court held an evidentiary hearing. On February 25, 2004, the postconviction court issued an order denying all of the claims raised in Archer's motion. Archer now appeals the postconviction court's denial of the motion, raising a newly discovered evidence claim, a Giglio[4] claim, and a Brady[5] claim.

A. Newly Discovered Evidence Claim
Archer claims that newly discovered evidence based on the recantation of Patrick Bonifay establishes his innocence and requires that he receive a new trial.
To obtain relief based on newly discovered evidence, a petitioner must satisfy two prongs. First, the evidence offered must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that neither defendant nor his counsel could have known of it by the use of diligence. Second, the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial. Jones v. State, 709 So.2d 512, 521 (Fla.1998).
On February 26, 2001, at a hearing during Bonifay's own postconviction proceedings, Bonifay recanted his testimony from Archer's trial. Speaking directly with the court against his counsel's advice, Bonifay stated that there was never any arrangement between Bonifay and Archer to kill the intended victim, Daniel Wells. Bonifay explained that he was tired of lying and that he did not want to have the blood of another man on his hands.
At the evidentiary hearing on Archer's postconviction motion, Bonifay again recanted his testimony. At one point in the *1194 testimony, Bonifay stated that Archer had no involvement in the crime, but Bonifay later admitted that Archer supplied information about the layout of the store, including the location and amount of money inside. Bonifay insisted, though, that Archer did not offer Bonifay money or coerce Bonifay to kill the clerk. Bonifay explained that he fabricated the story about Archer's involvement in an attempt to shift blame and avoid the death penalty. Bonifay also explained that Archer did not necessarily know he was delivering the murder weapon to Bonifay since he received the gun in a bag from Bonifay's friend and may not have known what was inside the bag when it was delivered to Bonifay.
The postconviction court found that Archer failed to satisfy both prongs of the newly discovered evidence standard. On the first prong, the postconviction court held that Bonifay's recantation was not newly discovered evidence because Archer knew at the time of the trial that Bonifay was lying. We reject this rationale.
It is correct that not all recantations will be considered newly discovered evidence. See, e.g., Jones v. State, 678 So.2d 309, 313 (Fla.1996) (finding defendant's reliance on Court's traditional treatment of recantations as newly discovered evidence misplaced because defendant's situation was not the typical case where a witness suddenly recanted his or her trial testimony years after the fact). A recantation will not be considered newly discovered evidence where the recantation offers nothing new or where the recantation is offered by an untrustworthy individual who gave inconsistent statements all along. Jones, 678 So.2d at 312-13 (finding that recantation "simply offers nothing new" because the witness had already been impeached at trial with a prior sworn statement which was consistent with the recantation); Walton v. State, 847 So.2d 438, 454-55 (Fla.2003) (finding that recantation was "simply a new version of the events from a witness/participant who has presented multiple stories since the time of the occurrence of the events themselves"); Smith v. State, 400 So.2d 956 (Fla.1981) (finding that recantation testimony was cumulative to the evidence introduced at trial because both court and counsel were aware that prior to trial the recanting witness had confessed to the crime and said that defendant was not involved).
However, in this case, the postconviction court erred when it rejected the claim based on what the postconviction court concluded was Archer's knowledge of Bonifay's testimony at the time of the trial. We find that a recantation is not precluded from being considered newly discovered evidence simply because the defendant knew, as reflected by what the defendant claimed the facts to be, that the recanting witness was not telling the truth at the time of the trial or because the defendant took the stand to testify contrary to the witness. See Burns v. State, 858 So.2d 1229 (Fla. 1st DCA 2003); Lee v. State, 677 So.2d 312 (Fla. 1st DCA 1996). The appropriate question was whether Archer was or should have been aware of the existence of evidence that would demonstrate that Bonifay's testimony was false.
The evidence at issue here is the recantation testimony of Patrick Bonifay. Although Archer knew that Bonifay's testimony was contrary to Archer's stated knowledge of the facts, the record contains no evidence upon which to conclude that Archer could have established that Bonifay was in fact lying in his trial testimony. *1195 According to the evidence in the postconviction record, Bonifay did not recant before his own postconviction proceeding testimony. Bonifay's recantation clearly offers something new to this case. Indeed, the recantation offers a completely different version of the facts that, if true, could undermine Archer's conviction and sentence. We therefore find that the recantation evidence in this case was newly discovered evidence.
On the second prong, the postconviction court found that Bonifay's recantation was not credible and therefore would not produce a different result at a new trial. Emphasizing the contrast between Bonifay's prior testimony and his recantation, the court explained its analysis as follows:
The Court heard Bonifay's recantation and had extensive opportunity to observe his testimony on more than one occasion and finds that it lacks credibility. Jury Instruction 2.04 on the credibility of witnesses can provide a framework for credibility analysis. Did Bonifay seem to have an accurate memory? His memory seemed more accurate in 1991. Was Bonifay honest and straightforward in answering the attorney's questions? He seemed to be hedging often during his testimony, but more so in his recantation. Did Bonifay have an interest in how the case should be decided? If this was not a planned murder but simply a robbery gone bad, then Bonifay is probably not eligible for the death penalty, so his recantation could potentially affect the imposition of the death penalty against Bonifay. Did Bonifay at some other time make a statement that is inconsistent with the recantation? Bonifay's first three statements about this murder consistently pointed to Defendant as the mastermind, contrary to his recantation. Has Bonifay been convicted of a crime? Bonifay is on death row.
State v. Archer, No. 91-0606-J, order at 23 (Fla. 1st Cir. order filed Feb. 25, 2004).
The court then evaluated each of Bonifay's prior statements and found that all together the prior statements consistently portrayed Archer as the mastermind of the crime. The Court then stated:
Now, some 12 years after these statements, Bonifay, after an alleged religious conversion, has announced that Defendant had nothing to do with this crime. However, even in his recantation Bonifay implicates Defendant. Bonifay reiterates that Defendant told him how to commit the crime, where the security measures were, where the money was kept, which store served as the collection point for the money from all the stores, and more. Bonifay now denies that Defendant asked him to kill someone, but reasserts that Defendant did have a problem with Daniel Wells. On cross examination, Bonifay was asked: "How did you know that the wrong man was killed if Mr. Archer hadn't told you who needed to be killed?" and he answered: "Because I was informed that on a certain day, a certain person would work there."
Based on the Court's experience, common sense, and personal observations of Patrick Bonifay, the Court is satisfied that this new testimony is false. After listening to Mr. Bonifay, observing his demeanor, and analyzing his testimony, the Court does not believe his recantation.
State v. Archer, order at 26 (record citations omitted).
Archer claims that the record does not support the postconviction court's finding *1196 that the recanted testimony was not credible. We disagree.
This Court's decision in Armstrong v. State, 642 So.2d 730 (Fla.1994), sets forth the principles to be followed when evaluating recantations.
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. "Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." Only when it appears that, on a new trial, the witness's testimony will change to such an extent as to render probable a different verdict will a new trial be granted.
Id. at 735 (citations omitted) (quoting Bell v. State, 90 So.2d 704, 705 (Fla.1956)). Since Armstrong, this Court has repeatedly observed that recantations are "exceedingly unreliable." See, e.g., Johnson v. State, 769 So.2d 990, 998 (Fla.2000); Lightbourne v. State, 742 So.2d 238, 247 (Fla.1999); State v. Spaziano, 692 So.2d 174, 176 (Fla.1997). Accordingly, this Court has stressed caution in assessing recantations. Robinson v. State, 707 So.2d 688, 691 (Fla.1998).
When a newly discovered evidence claim relies on an admission of perjury, the critical issue of credibility necessarily arises. This Court is highly deferential to a trial court's judgment on the issue of credibility. Johnson, 769 So.2d at 1000 ("This Court will not substitute its judgment for that of the trial court on issues of credibility."); Robinson v. State, 865 So.2d 1259, 1262 (Fla.2004) ("The trial court has made a fact-based determination that the recantation is not credible. In light of conflicting evidence we must give deference to that determination."). As this Court observed in Spaziano, "the trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony. The cold record on appeal does not give appellate judges that type of perspective." Spaziano, 692 So.2d at 178. Thus, a trial court's determination of a recantation's credibility will be affirmed as long as it is supported by competent, substantial evidence. Marquard v. State, 850 So.2d 417, 424 (Fla.2002).
Archer argues that the postconviction court failed to consider the following evidence, which establishes that the recantation is credible: the context in which Bonifay recanted; the inconsistency of Bonifay's prior testimony; and the various evidence that corroborates Bonifay's recantation.
Archer first submits that Bonifay recanted in a genuine context. Bonifay spontaneously recanted against his attorney's advice and appears to have come forward on his own volition without instigation from Archer. However, as the postconviction court noted, Bonifay could have been motivated by the fact that an acquittal of Archer could lead to a resentencing for himself. If Bonifay could establish that Archer was not involved in the murder and that there was no plan to murder but just a plan to rob, he would have a basis upon which to challenge the cold, calculated, and premeditated aggravating *1197 factor (CCP). Archer contends that Bonifay had nothing to gain by recanting and repeatedly points out that Bonifay is no longer eligible for the death penalty because he was a juvenile when he committed the crime. However, at the time of Bonifay's original recantation in February of 2001, the Supreme Court had not yet decided that juveniles could not be executed. See Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Bonifay still faced the death penalty and was in the middle of his postconviction proceedings when he originally recanted. We conclude that the context of the recantation does not strongly weigh against the trial court's finding that Bonifay's recantation was not credible.
As a second point, Archer argues that Bonifay's prior testimony had "critical inconsistencies." In particular, Archer focuses on Bonifay's testimony at trial that he committed the murder because Archer offered him $500,000 in a briefcase and because Archer later threatened to harm Bonifay's girlfriend and mother if he did not go through with the plan. Archer argues that Bonifay's testimony is inconsistent because he did not mention the $500,000 or the threat in his recorded confession to police. Archer claims that Bonifay continued to "embellish" his version of events each time he testified. We do not find this argument persuasive in overcoming the trial court's finding that even though Bonifay did not specifically state that he had been offered cash in the amount of $500,000, Bonifay did state in his recorded confession to police that Archer promised to pay him if he killed Wells. Bonifay's prior testimony consistently portrayed Archer as the individual who instigated the crime and provided the inside information.
Archer argues that the postconviction court ignored evidence that corroborates Bonifay's recantation, including the following: Clifford Barth's testimony that Bonifay asked him to lie about Archer's involvement; the prosecuting attorney's admission that he did not believe Bonifay's trial testimony; the inconsistency between the State's position at Archer's trial and at Bonifay's trial; and the fact that Bonifay's recantation does not completely exonerate Archer.
We do not find that the record supports Archer as to the extent and significance of this corroboration. Barth's testimony only corroborates a portion of Bonifay's recantation. Barth testified at Archer's resentencing that Bonifay asked him to falsely testify that Archer threatened him. Barth then testified at the postconviction evidentiary hearing that Bonifay asked him to falsely testify that the crime was a murder for hire. However, Barth also consistently testified that Archer knowingly supplied the gun and the inside information necessary to commit the crime. Thus, Bonifay's testimony only corroborates Bonifay's recantation of his statements about the threats and the offer of money, but it does not corroborate Bonifay's recantation claim that Archer was only minimally involved in the crime.
Archer next argues that the postconviction court failed to properly consider that even the prosecutor did not believe Bonifay's testimony. But our review of the record shows that Archer overstates the extent to which the prosecutor testified that he did not believe Bonifay's trial testimony. The prosecutor only testified that he did not believe Bonifay's statements about Archer threatening harm to Bonifay's mother and girlfriend. He did not testify that he had known of evidence which refuted Bonifay's claims. The prosecutor merely testified to his own conclusions *1198 about what Bonifay had stated about the threats.
In sum, Archer has not provided a basis upon which we can conclude that he has met the substantial burden of overcoming the postconviction court's conclusion as to the credibility of the recanted testimony. To the contrary, we conclude that there was competent, substantial evidence in support of the postconviction court's rejection of Bonifay's recanted testimony.
First, the postconviction court found that compared to his prior testimony, Bonifay hedged more and that his memory was less accurate during the recantation.[6] The postconviction court noted that Bonifay's prior testimony consistently pointed to Archer as the mastermind of the crime.
Second, the postconviction court found that Bonifay's recantation was self-serving. As previously mentioned, Bonifay was still death-eligible at the time of the recantation. We do not conclude that the postconviction court's conclusion that Bonifay's recantation may have been thought by Bonifay to potentially affect his death sentence was unreasonable. The court also expressed skepticism about Bonifay's claim that an "alleged religious conversion" was the reason he suddenly recanted after twelve years. See Jones, 709 So.2d at 521-22 (holding that a trial court, in evaluating a newly discovered evidence claim, "may consider both the length of the delay and the reason the witness failed to come forward sooner").
Third, the postconviction court noted that Bonifay was a convicted felon on death row.
Fourth, the postconviction court found that Bonifay's statement to law enforcement officers on February 11, 1991, at Archer's trial in July 1991 and at the penalty phase in his own trial was consistently that Archer had told him to kill the store clerk. On the other hand, the postconviction court found that Bonifay's recantation was internally inconsistent because Bonifay could not adequately explain why he told police that he had killed the wrong man when there was supposedly no plan to kill. When asked at the evidentiary hearing how he knew the wrong man had been killed, Bonifay stated that he "was informed that on a certain day, a certain person would work there."
In addition to the reasons cited by the postconviction court, we note that Bonifay's recantation is also inconsistent with the testimony of George Wynn, Daniel Webber, and Clifford Barth.
Wynn, a friend of Bonifay's, testified at Archer's trial and resentencing that on the Friday night shortly before the failed attempt, Bonifay tried to recruit Wynn to participate in the crime. According to Wynn, Bonifay stated that Archer had asked him to kill somebody and make it look like a robbery. When asked at the guilt-phase trial why Archer would want to have the clerk killed, Wynn testified that Bonifay told him it was because of "[p]roblems between them, I guess he didn't like the guy." Thus, according to Wynn's testimony, there was a plan to murder before the crime took place. This directly conflicts with Bonifay's recantation statement that there was only a plan to rob. This *1199 also conflicts with Bonifay's recantation statement that he did not fabricate the story about Archer's involvement until after Bonifay's arrest.
Webber, who was allowing Archer to stay at his house at the time of the crime, testified at Archer's trial and resentencing that Archer admitted on the day after the crime that he had told the robbers how to commit the crime. This included the instruction that the robbers shoot the clerk in the back of the head. Thus, according to Webber's testimony, Archer told the robbers that they had to mortally wound the clerk. This conflicts with Bonifay's recantation testimony, which denied that there was a plan to murder and which only implicated Archer to the extent that Archer supplied information about the store's layout.
Barth, a participant in the crime, testified at Archer's resentencing and at the postconviction evidentiary hearing that Bonifay asked him to falsely testify at Bonifay's trial that Bonifay was under the influence of marijuana during the crime so that Bonifay would appear less culpable for his conduct. Barth testified at Archer's resentencing that Bonifay was not high when the crime occurred. This directly conflicts with Bonifay's recantation testimony that he was scared, panicked, and under the influence of marijuana.
As previously set forth, our precedent requires that this Court defer to the trial court's finding on credibility when that finding is supported by competent, substantial evidence. See, e.g., Porter v. State, 788 So.2d 917, 923 (Fla.2001) ("We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact."). Accordingly, we affirm the postconviction court's denial of relief because a recantation which is not credible would not produce an acquittal or a life sentence on retrial.

B. Giglio Claim
Archer claims that the State committed a Giglio violation when it knowingly presented the false and prejudicial testimony of Patrick Bonifay. To establish a Giglio violation, a petitioner must show that (1) the testimony was false, (2) the prosecutor knew the testimony was false; and (3) the testimony was material. Craig v. State, 685 So.2d 1224, 1226 (Fla.1996). This Court has repeatedly noted that "[t]he thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Ventura v. State, 794 So.2d 553, 562 (2001) (quoting Robinson v. State, 707 So.2d 688, 693 (Fla.1998)).
Archer's claim that the State knowingly presented false testimony is based upon the testimony of Assistant State Attorney Patrick Patterson at the postconviction evidentiary hearing. The prosecutor's testimony was:
Q. [Collateral Counsel] You put on testimony from Mr. Bonifay in Mr. Archer's proceeding that indicated that Mr. Archer allegedly made a threat against Mr. Bonifay's mother and girlfriend if Mr. Bonifay didn't do this crime. Do you recall that?
A. [Patterson] That was Mr. Bonifay's testimony, yes, sir.
Q. You recall that, correct?
A. I recall Mr. Bonifay testifying that way, yes, sir.
Q. You knew, sir, when you put that testimony on, in your heart that that was untrue?

*1200 A. You know, to go into my heart, it was the State's theory of the case in Mr. Bonifay's trial and in Mr. Archer's trial that the act was not committed as a result of threats. So, yes, I did not believe that that's why this crime was committed.
....
Q. Did you ever inform Mr. Lang that you believed that that truetestimony was untruthful with respect to the threat?
A. I cannot remember a specific instance, but it would not surprise me if I had.
Q. Did you attempt to correct in your closing argument with the jury that threat as being not credible testimony?
A. The greater weight of the evidence, I believe, was that the threat was not credible. It was clear to me from the proceedings that that was made evident to the jury. I do think I told the jury that Mr. Bonifay or a portion of Mr. Bonifay's testimony was about as credible as Mr. Archer's.
....
Q. You believed in your heart that what Mr. Bonifay was saying about the threat was untruthful, correct?
A. Yeah. I think the greater weight of the evidence was that that was not correct. And that's true of other little parts of Mr. Bonifay's testimony. There were other parts of it that I think in an effort to absolve himself, he honed probably what really happened. I have no direct evidence that that threat did not occur. I did not have any testimony or other evidence of any kind that the threat didn't occur when I put him on the stand. But I thought the greater weight of the evidence was that it was not so. And that's not why the crime happened.
The postconviction court denied Archer's Giglio claim and found the following:
Defendant simply cannot prove that Bonifay lied about these matters. Bonifay made several statements concerning the alleged threats and money, and in some statements he claimed they existed and in other statements he did not disclose one or both of them. There is no way to ascertain on which occasion Bonifay was actually telling the truth.
The prosecutor was not a party to the conversations involving the threats or money, so has no personal knowledge of whether Bonifay was telling the truth about them. This is a stark contrast to the cases cited supra, in which the prosecutors had personal knowledge of the falsity of the testimony because the testimony pertained to agreements between the witness and the state.[n.] Defendant claims that he met his burden of showing that the prosecutor knew Bonifay was lying because the prosecutor testified at the evidentiary hearing that he personally did not believe Bonifay's testimony about the threats. However, disbelieving a witness does not equate to knowing that a witness is lying. Defendant has not shown that the prosecutor knew the statement was a lie.
[n.] Perhaps this problem is why the relevant cases on this point focus on instances where the witness lies about a deal, as opposed to lying about something else.
State v. Archer, order at 19-20.
Archer contends that he met his burden of proving that the prosecutor knew the testimony was false because Patterson *1201 admitted at the evidentiary hearing that he believed Bonifay's trial testimony was untrue. However, as the record reflects, Patterson only testified that he believed that the weight of the evidence showed that Bonifay's testimony about Archer's threat to harm Bonifay's mother and girlfriend was not credible. In addition, Patterson testified at the postconviction hearing that he had no personal knowledge that Bonifay's testimony was untrue.
Q. [State's Attorney] You had no other knowledge that this jury did not have?
A. [Patterson] I don't believe I did.
. . . .
Q. [Collateral Counsel] Would it be fair to say that you wanted to inform the jury in Mr. Bonifay's case that the testimony was untruthful?
A. [Patterson] No, sir. I have no way of knowing whether the testimony is truthful or not. There was no direct testimony and, to my knowledge, up through today, I know of no direct testimony of someone saying that the threats did not occur, that that is false testimony.
I thought the greater weight of the evidence in that trial wasand the more persuasive argument was that the threats were not credible, or at least the threats were not credible in the sense that they caused him to do this act. You know, whether the threats occurred or not really was not the point. The point was did he do these acts because of the threats and, clearly, I think the greater weight of the evidence was he did not.
We find no error in the postconviction court's denial of relief on this claim. The prosecutor's candid skepticism does not demonstrate that the prosecutor had evidence that Bonifay falsely testified about the threat. Patterson consistently testified that he had no evidence about whether the threat occurred or whether Bonifay was perjuring his testimony.
Archer also contends that a Giglio violation is demonstrated by the inconsistent positions taken by the prosecutor at the trials of Bonifay and Archer. Bonifay's guilt-phase trial was held immediately prior to Archer's guilt-phase trial. At Bonifay's trial, the prosecutor argued that there was no evidence of a threat and that Bonifay made up the story about the threat in an attempt to avoid responsibility. At Archer's trial, the prosecutor called Bonifay as a witness, and Bonifay testified that he killed the clerk because Archer threatened to harm Bonifay's family. Archer contends that this is an inconsistency which shows that Patterson knew or should have known that Bonifay's testimony at Archer's trial was false.
We disagree. In Archer's case, Patterson never argued to Archer's jury that it should believe Bonifay's testimony about the threat or that the State's case in any way relied on the threat. Archer points to no facts which the State concealed from the jury in Archer's case. We therefore do not find that the postconviction court erred in not granting relief on this basis.
In sum, we do not find a record basis to support Archer's assertion that the State presented evidence that the State knew to be false. We therefore affirm the postconviction court's denial of the Giglio claim.

C. Brady Claim
Archer claims that the State committed a Brady violation when it withheld evidence of burglaries committed by Patrick Bonifay, Clifford Barth, and George Wynn. *1202 Archer contends that the evidence could have been used to impeach the witnesses and to also show that Bonifay was capable of committing the crime without the aid or influence of Archer.
To establish a Brady violation, a petitioner has the burden of proving that (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice to the defendant has ensued. The prejudice prong is determined by examining whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Maharaj v. State, 778 So.2d 944, 953 (Fla.2000) (citing Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). A petitioner has the burden of demonstrating each prong of a Brady violation. Duckett v. State, 918 So.2d 224, 235 (Fla.2005); Wright v. State, 857 So.2d 861, 870 (Fla. 2003).
Archer first claims that the State withheld evidence that Bonifay was involved in a burglary in Mississippi. The postconviction court held:
The existence of Bonifay's Mississippi case is not a Brady violation because the prosecutor did not have any reports or documents on it to turn over, and Defendant himself knew about the case. Furthermore, Defendant himself testified about the Mississippi matter at his trial. So, if there was a nondisclosure, it was not prejudicial.
State v. Archer, order at 21 (record citations omitted). We do not find that the court erred since Archer has not established that the State had information that he did not have about the Mississippi burglary. Assistant State Attorney Patterson testified at the postconviction evidentiary hearing that the State only knew that Bonifay had been implicated in a violent burglary in Mississippi. Patterson further testified that he was not able to obtain any paperwork on the Mississippi incident. Archer testified at the guilt phase of his trial that he had assumed that Bonifay was responsible for the Trout crime because Bonifay "had just come back from Mississippi for stabbing a man while robbing his establishment." In addition, the attorney who represented Archer at his resentencing testified at the postconviction evidentiary hearing as follows:
Q. Did Mr. Archer know about the Mississippi stabbing case?
A. It is my recollection that he did and we talked about it.
We have held that the State is not considered to have suppressed evidence if such evidence was already known to the defense. See Maharaj, 778 So.2d at 954 ("[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant."). Furthermore, resentencing counsel testified that he did not go into the Mississippi case because he did not want Archer to appear to be associating with "thugs."
Moreover, when asked whether he was aware of Bonifay's involvement in the Mississippi burglary, the attorney who represented Archer at the guilt phase of his trial testified: "I don't recall if I was aware or not. I don't have any independent recollection that I was. It very well may have been that Mr. Archer and I discussed it since he testified to it in direct. I just don't know." Thus, Archer *1203 did not establish through guilt-phase counsel that evidence of the Mississippi burglary was not disclosed to him. Therefore, we find that Archer failed to meet his burden of proving that the State suppressed evidence. Wright, 857 So.2d at 870 ("The burden is on the defendant to demonstrate that the evidence he claims as Brady material satisfies each of these elements.").
Archer next claims that the postconviction court erred in denying his Brady claim based upon the State's alleged failure to produce police reports concerning the burglary of All Pro Sound, a stereo, television, and entertainment store. Trial witnesses Bonifay, Barth, and Wynn were involved in this burglary, which took place approximately one month prior to the Trout robbery and murder that are the subject of this case.
In his detailed order denying Archer's postconviction motion, the trial judge set out why he concluded that relief should not be granted based upon the All Pro Sound burglary. In respect to George Wynn, the postconviction court stated:
George Wynne did testify at Defendant's guilt and resentencing phases. However, even though Defendant's attorneys did not have the report, there was some knowledge of the All Pro case amongst the four defense attorneys. At the July 16, 1991 deposition of witness George Wynne, attended by all defense attorneys in this case except for Defendant's, Bonifay's attorney asked Wynne if he had "made a deal yet as far as the All Pro burglary thing." In spite of the fact that three of the defense attorneys herein were in the room, there is no evidence that any of those attorneys pursued the All Pro case reports or used it for impeachment purposes at trial. The prosecutor has consistently testified that he does not believe he had the reports, and if he had, he would have turned them over in discovery.
State v. Archer, order at 14-15.
Archer maintains that the postconviction court erred in the holding because the court placed upon Archer a "due diligence" requirement to discover the suppressed material. We agree with Archer that we have held that a defendant is not required to compel production of favorable evidence which is material, in that the evidence tends to negate the guilt of the accused or tends to negate the punishment. See Allen v. State, 854 So.2d 1255, 1259 (Fla.2003); Maharaj, 778 So.2d at 953-54. To comply with Brady, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case and to disclose that evidence if it is material. Allen, 854 So.2d at 1259. The postconviction court is in error to the extent that the court's order is read to mean that Archer had to demonstrate "due diligence" in obtaining favorable evidence possessed by the State or that the prosecutor's obligation was only to give to Archer favorable evidence which was in the prosecutor's personal possession.
However, though we point out that there is no "due diligence" requirement in the Brady test and that the prosecutor is charged with possession of what the State possesses, we do not conclude that in this case the trial court erred in denying Archer's Brady claim based upon the All Pro Sound burglary police reports. Archer has not demonstrated that there was such favorable evidence in those police reports about which Archer was unaware that the instant case is put in such a *1204 different light as to undermine confidence in the guilty verdict or death sentence.
The postconviction evidentiary record does reflect that Archer knew that his codefendants had been involved in other burglaries even though it is unclear what Archer knew about the All Pro Sound burglary. As the postconviction court stated in its order, the record shows that there was some knowledge about the All Pro Sound burglary on the part of the attorneys representing the defendants in the Trout murder and robbery case. In a deposition of George Wynn taken on July 16, 1991,[7] attended by counsel for all of the defendants except Archer, the following question was reported: "Have you made a deal yet as far as the All Pro burglary thing?" There is no record explanation as to why Archer's counsel was not at the deposition. In addition, Archer's attorney from his first trial, Brian Lang, stated that he had no recollection of the All Pro Sound burglary, testifying, "I don't know that I knew of the All Pro unless Archer told me and unless the files reflect that." This is the sum of the record of Archer's knowledge or lack of knowledge about the All Pro Sound burglary with respect to the guilt-phase trial and the first sentencing proceeding.
Upon reversal of the first death sentence, Spiro Kypreos was appointed as Archer's new counsel. Counsel Kypreos testified at the postconviction hearing:
Q. What about there was also in the 3.850 there was a reference to this All Pro Sound. Were you aware of that situation?
A. I recall speculation by Mr. Archer that there had been burglars at that time. What was new to me
Q. Well, let me ask you this, All Pro Sound, supposedly
A. Wait, can I answer your other question completely and honestly, I didn't know about All Pro Sound specifically or the specific information that is set out in that motion, I want to be clear on that, I didn't know that.
Thus, although counsel Kypreos was not aware specifically of the All Pro Sound burglary, his testimony was that Archer was apparently aware of other burglaries. Moreover, as set forth earlier, the record is clear that Archer knew of Bonifay's involvement in the Mississippi burglary, about which he testified in the guilt phase of his trial and discussed with resentencing counsel.
As previously stated, we find no error in the postconviction court's determination that Archer failed to demonstrate that not turning over the police reports suppressed information which could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. As the postconviction court's order explains, evidence about the All Pro Sound burglary was both favorable and unfavorable for Archer's case as it pertained to Wynn, Bonifay, and Barth, the three witnesses who testified at Archer's trial. The information about the All Pro Sound burglary clearly reinforced that Archer was associating with men who had committed a burglary close in time and distance to where the Trout murder and robbery were committed. While it would show that the All Pro Sound crime had been nonviolent, it could have served to corroborate Wynn's testimony at Archer's trial that he declined to get involved in the *1205 Trout crime because Bonifay had told Wynn that Archer "wanted one person killed."
We affirm the postconviction court's denial of the Brady claim.

III. PETITION FOR WRIT OF HABEAS CORPUS
Archer claims that his counsel on direct appeal was ineffective in various respects. To prove ineffective assistance of appellate counsel, a claimant must show that appellate counsel performed deficiently and that the deficiency compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result. Owen v. Crosby, 854 So.2d 182, 188-89 (Fla. 2003). Appellate counsel cannot be deemed ineffective for failing to raise a claim which in all probability would have been without merit on direct appeal. Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000).
Further, appellate counsel cannot be ineffective for failing to raise issues not preserved for appeal. See Owen v. Crosby, 854 So.2d 182, 188-89 (Fla.2003); Medina v. Dugger, 586 So.2d 317, 318 (Fla. 1991). The only exception to this rule is when the claim involves fundamental error. See Roberts v. State, 568 So.2d 1255, 1261 (Fla.1990). Fundamental error is error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1997) (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)).

A. Failure of Appellate Counsel to Challenge Bonifay's Statements about Archer
Archer first claims that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred when it allowed the following two pieces of testimony: (1) Bonifay's testimony that he was afraid of Archer's "gun" and "associates"; and (2) Bonifay's testimony that Archer had a source of income other than Archer's work that generated significant amounts of cash.
We do not find that Archer has presented a basis for habeas relief. The claim was not adequately preserved at trial. After Bonifay stated that he was afraid of Archer's gun and associates, defense counsel immediately asked the judge if counsel could approach the bench. A short colloquy then ensued between counsel and the judge, at which time defense counsel expressed his concern that objectionable testimony would come up under the prosecutor's new line of questioning. However, defense counsel did not make a specific objection to the gun and associates statement. In fact, defense counsel had not made any objection with respect to Bonifay's testimony up to that point. During the colloquy, the trial judge ruled that he would allow Bonifay to testify regarding "his opinion relative to the money that has been brought directly into issue in this case by [defense counsel's] very strong and direct positive continuous questioning about that." Defense counsel then made an objection on the basis that Bonifay's expected testimony would be an opinion. Defense counsel did not make an objection on the basis that the testimony was inflammatory or irrelevant. After the testimony resumed, Bonifay testified without any objection by defense counsel that he believed that Archer had a source of income other than Archer's work that generated significant amounts of cash.
Thus, no specific objections were made to the statements Archer now challenges. *1206 Moreover, the only general objection that was made was based on a different issue than the one that Archer now asserts. Accordingly, we find that the issue was not preserved for direct appeal. Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("Except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court. Furthermore, in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.").
We also reject Archer's claim that the statements caused fundamental error because they were "so egregious as to deprive Petitioner of a fair trial." Archer has not met the high burden of showing that the trial court's error in admitting the statements reached down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the error.
Bonifay's statement did not link Archer to any criminal activity other than the Trout Auto Parts robbery and murder. Bonifay never stated that Archer's source of income was illegal. He simply stated that Archer had a source of income besides work that generated large sums of cash. Nor did Bonifay's testimony about Archer's gun and associates implicate Archer in any illegal enterprise. Bonifay stated only that these things were the sources of Bonifay's fear of Archer.
We therefore deny habeas relief on this claim.

B. Failure of Appellate Counsel to Challenge Testimony Regarding Weapon
Archer next claims that appellate counsel was ineffective for failing to argue on direct appeal that the trial court committed error when it allowed the State to present inappropriate testimony regarding Archer's possession of the murder weapon. In particular, Archer argues that testimony by Barth and Bonifay regarding Archer's possession of the gun was prejudicial and improperly required the jury to stack inference upon inference to conclude that Archer had in fact possessed the gun.
We conclude that Archer has failed to demonstrate that such an argument would have prevailed on appeal. The prosecution presented direct eyewitness testimony to show that Archer possessed the gun and then later provided it to Bonifay. Bonifay testified that (1) he asked Kelly Bland to provide a gun for the crime; (2) Bland delivered the gun to Archer; and (3) on Friday night, Archer delivered the gun to Bonifay. Barth corroborated this testimony by testifying that (1) he and the other participants went to pick up the gun at Archer's place; (2) Bonifay got out of the car; (3) Bonifay went with Archer over to Archer's truck; and (4) when Bonifay returned to the car, Bonifay had the gun. When shown the murder weapon at trial, Barth testified that although he did not know for sure, the gun looked like the one he saw that night.
This testimony constitutes competent evidence of Archer's possession of the gun. No impermissible stacking of inferences is necessary to conclude from this evidence that Archer was linked to the crime via the murder weapon. Archer thus fails to demonstrate that his claim would have had any merit on direct appeal. Therefore, Archer cannot demonstrate that appellate counsel was ineffective for failing to raise this issue. We therefore deny habeas relief on this claim.

IV. CONCLUSION
For the reasons discussed above, we affirm the circuit court's denial of postconviction *1207 relief and deny the petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The trial court found the following two aggravating factors: (1) the crime was committed while Archer was engaged in or was an accomplice in a robbery; and (2) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP).
[2] The trial court found the following mitigating factors: (1) Archer had no significant history of prior criminal activity (accorded significant weight); and (2) Archer was a good family member to his grandmother (accorded some weight).
[3] Archer raised the following claims in his rule 3.850 motion: (1) the State knowingly presented the false testimony of Patrick Bonifay; (2) the State withheld material evidence from Archer, including (a) evidence of other robberies committed by Patrick Bonifay, Clifford Barth, and George Wynn, (b) Clifford Barth's testimony at Patrick Bonifay's trial, (c) a polygraph report of Daniel Wells, (d) the criminal history of Daniel Webber, and (e) handwritten notes from a police interview with Daniel Wells; (3) defense counsel was ineffective for failing to investigate and present impeachment material; (4) defense counsel was ineffective for failing to seek a change of venue due to prejudicial pretrial publicity; (5) newly discovered evidence proved Archer's innocence, including Bonifay's admission to a prison inmate that he framed Archer, testimony by Eddie Fordham exculpating Archer and suggesting prosecutorial misconduct, and Bonifay's recantation; (6) defense counsel was ineffective during voir dire; (7) defense counsel was ineffective for failing to present mental health mitigation; (8) Archer is innocent of first-degree murder; (9) Archer is innocent of the death penalty; (10) the penalty-phase jury instructions improperly shifted the burden to Archer; (11) the trial court erroneously instructed the jury to decide whether an expert witness was qualified to testify; (12) the jury received inadequate guidance on aggravating factors; (13) Archer's death sentence is unconstitutionally predicated on an automatic aggravating factor, and defense counsel was ineffective to the extent that he failed to preserve this claim; (14) the trial court improperly diluted the jury's sense of responsibility, and defense counsel was ineffective to the extent that he failed to preserve this claim; (15) the rule prohibiting counsel from interviewing jurors is unconstitutional; (16) the jury was improperly instructed on the unconstitutionally vague CCP aggravating factor; (17) Florida's capital sentencing statute is unconstitutional on its face and as applied to Archer, and defense counsel was ineffective to the extent that he failed to preserve this claim; (18) cumulative error deprived Archer of a fundamentally fair trial; (19) Archer is insane; (20) the trial court improperly admitted inflammatory photographs of the victim's body, and defense counsel was ineffective to the extent that he failed to preserve this claim; and (21) the Florida statute providing a choice between electrocution and lethal injection is unconstitutional.
[4] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[6] Archer claims that the postconviction judge, Judge Michael Jones, had no basis upon which to compare Bonifay's prior testimony with Bonifay's postconviction testimony because Judge Jones did not preside over the original trial proceedings. We do not agree. While Judge Jones was not present for the original testimony, Judge Jones was present for the live testimony by Bonifay in which he recanted the original testimony. It was the credibility of the recanted testimony that Judge Jones had to evaluate.
[7] The deposition was taken in the case of State v. Larry Fordham, Robin Archer, Clifford E. Barth, and James Bonifay, No. 91-579, in the Circuit Court of the First Judicial Circuit, in and for Escambia County, Florida.