TORPY, J.
 

 Appellant was convicted of first-degree murder and shooting into an occupied vehicle arising from a drive-by shooting. The trial court initially denied Appellant’s motion for postconviction relief without a hearing, but we reversed and remanded for an evidentiary hearing on several claims. After the evidentiary hearing, during which the trial court permitted an amendment to include an additional claim of newly discovered evidence, the trial court again denied relief. We reverse.
 

 Appellant was convicted of murdering LaShay Copeland (“the victim”) in a drive-by shooting at 3:10 a.m. on January 3, 2004. An altercation an hour earlier between members of the Biggs and the Patterson families motivated the shooting. The altercation involved Antonio Biggs (“Antonio”), his brother, Antwan Biggs (“Antwan”), and their uncle, Isaac Hughey, on one side and Reggie Patterson (“Reggie”) and his cousins Allen Patterson (“Allen”) and Keith Holloway (“Holloway”), on the other side. During the melee, the windshield on Reggie’s Crown Victoria was cracked, and Reggie and Allen threatened to kill members of the Biggs family. Appellant was indisputably neither involved in nor present during the altercation.
 

 After the altercation, Antonio and Antwan drove home. They called their mother, who was out with a friend. She instructed them to send their younger brother, Trevon, to pick her and her friend up, and then she called the police department to report the incident. Trevon and his girlfriend, the victim, went to pick up his mother and her friend in the same truck that his brothers had been driving earlier. As the four neared the Biggs residence, they saw Reggie’s Crown Victoria parked with its lights off near an intersection. When they turned at the intersection, one or more occupants of the Crown Victoria shot into the Biggs vehicle, striking the mother and the victim. The victim later died from a bullet wound. The weapons used in the murder were never found.
 

 Although Appellant had no connection to the earlier confrontation, and had no apparent motive for the crime, he was connected to the shooting primarily through the testimony of Trevon. At trial, Trevon identified Appellant (who is apparently Trevon’s cousin) as the person who was shooting from the right front seat of the Crown Victoria. Trevon admitted, though, that he had given contradictory statements to police and in his deposition. In those
 
 *552
 
 prior statements, Trevon acknowledged that he “couldn’t see the face” or the clothing of the front passenger.
 
 [1]
 
 At trial, he explained the apparent discrepancy as follows: “I couldn’t see the whole face, but I seen the part of the bumps. That is how I know it was him.” The “bumps” he referred to are the pock marks on Appellant’s face. Trevon acknowledged that he never said anything about seeing these “bumps” to the police or to defense attorneys during his deposition. His explanation for this omission was that he “wasn’t functioning right ... [and] wasn’t thinking right at the time....”
 
 [2]
 

 Other evidence at Appellant’s trial was similarly questionable. State witness Barry Trent, a former deputy sheriff, testified that he happened to be talking to Appellant in a holding cell when Appellant spontaneously said that he had been in a vehicle involved in a shooting. Trent denied that he had questioned Appellant and denied any prior knowledge of the shooting incident. On cross-examination, however, the defense established that Trent and the victim’s father were friends and telephone records proved that the two had exchanged numerous phone calls on the day of the murder. The trial court denied an attempt by the defense to call Trent’s former supervisor to offer evidence of bias.
 
 [3]
 

 In his defense, Appellant called his girlfriend, Reggie, and Holloway to testify. The girlfriend testified that she and Appellant were together from 10:00 p.m. until 5:30 a.m. on the day of the shooting. Reggie testified that he, Holloway, and Allen were the only ones in the Crown Victoria when the victim was shot and that it was Holloway who did the shooting. He said that Appellant was not in the car that night. Reggie admitted on cross-examination, however, that when he was initially interviewed by the police, he told them that Appellant was involved in the shooting. Holloway asserted his privilege against self-incrimination. He did interject, however, that “me and [Appellant] never seen each other.”
 

 After this Court affirmed his conviction,
 
 [4]
 
 Appellant filed a motion for postconviction
 
 *553
 
 relief, asserting that his trial counsel had been ineffective. Among other things, Appellant alleged that his trial counsel had been ineffective for failing to call Matthew Thomas (Holloway’s jail cellmate) and Ashley Barks (Allen’s girlfriend). Appellant also requested relief based on newly available testimony from Holloway, who by this time had waived his privilege against self-incrimination following his conviction and appeal. The trial court summarily denied relief after finding that Thomas’ and Holloway’s testimony would be cumulative with that of Reggie’s, and that Allen’s girlfriend’s testimony was irrelevant. We reversed for an evidentiary hearing on these claims.
 
 [5]
 

 On remand, a different judge conducted the evidentiary hearing.
 
 [6]
 
 Holloway’s cellmate testified that he had been in a holding cell with Holloway and that Holloway had confessed to shooting the victim. Holloway told the cellmate that Allen had been driving the car and that Reggie was the third passenger in the car when the shooting took place. Holloway also admitted to the cellmate that he and Reggie initially lied to the police when they said that Appellant was involved. The trial court concluded that the omission was not prejudicial because the cellmate could not have testified at trial. He reasoned that the testimony was not sufficiently corroborated, as required by section 90.804(2)(c), Florida Statutes. Although the trial court acknowledged that Reggie’s testimony might have supplied the needed corroboration, he concluded that because the jury had rejected Reggie’s testimony, the necessary corroboration was lacking. We disagree.
 

 Whether the omission by trial counsel was prejudicial must be viewed from the standpoint of what was known at the time of trial. At the time of trial, an objection based on lack of corroboration, if advanced, would have failed because other evidence corroborated that Holloway was involved in the shooting.
 
 See Perry v. State,
 
 675 So.2d 976 (Fla. 4th DCA 1996) (corroboration requirement satisfied if other evidence points to declarant as culpable party). Holloway had been involved in the earlier altercation during which threats were made to members of the Biggs family. Proof of motive coupled with Reggie’s inculpatory testimony was clearly sufficient to meet the threshold requirement for admission.
 

 As far as the cellmate’s credibility was concerned, we are unsure what aspect of the testimony was not deemed credible by the trial judge. The cellmate was simply reporting what Holloway had told him, which Holloway himself has now confirmed. In any event, the credibility of the cellmate — the “in-court witness” — was for the jury to determine.
 
 Carpenter v. State,
 
 785 So.2d 1182, 1203-04 (Fla.2001).
 

 We also disagree with the trial court’s determination of the admissibility and significance of the testimony of Allen’s girlfriend. Allen’s girlfriend testified at the evidentiary hearing that Allen is the father of her child. An hour before the altercation, she spoke with Allen on the phone
 
 *554
 
 who told her that he was with Reggie and Holloway. A few hours later, Allen, Reggie, and Holloway came to her house and borrowed her car. She did not see Appellant at all. The next day, the girlfriend heard about the shooting. She saw Allen on the phone “all that morning” talking about the girl who got shot and heard him say that “nobody would be able to find the weapons.” She confronted Allen who told her that the “girl wasn’t supposed to be in that truck.” She was told that Reggie had been in a fight and then Allen, Reggie, and Holloway left. She was cautioned by both Allen and Holloway not to “say anything.” When Allen found out about Appellant’s arrest, he thought it was funny and told his girlfriend that they had “the wrong person.” Allen also laughed when another person was arrested, but he did not laugh about Reggie’s arrest. Allen’s girlfriend stated that she was willing to testify at a new trial if one took place.
 

 The trial court concluded that Allen’s girlfriend’s testimony was not necessarily inconsistent with Appellant’s guilt and that much of her testimony was inadmissible hearsay. It concluded that her testimony concerning Allen’s statements would not have been admissible as statements against penal interest because Allen never expressly implicated himself and might have been available to testify but was not called at trial. We disagree. A statement need not be a complete confession to qualify as one made against one’s interest.
 
 Masaka v. State,
 
 4 So.3d 1274, 1280-81 (Fla. 2d DCA 2009). Here,
 
 Allen’s
 
 statements to his girlfriend clearly inferred guilt. For example, he knew that the weapons would not be found and that the victim was not the target of the shooting.
 
 See id.
 
 (even without direct confession, statements can be incriminating based on context). Allen also admonished his girlfriend to keep quiet, again suggesting guilt. As for Allen’s unavailability, we must assume that had counsel acted competently, counsel could have established the predicate by calling Allen and asking him about the statements made to his girlfriend, forcing him to assert his privilege against self-incrimination, or at least forming a predicate for the admission of statements for impeachment purposes as prior inconsistent statements.
 

 As far as the significance of the girlfriend’s other testimony, we view that issue de novo and reach a different conclusion than the trial court regarding its importance.
 
 See Sochor v. State,
 
 888 So.2d 766, 781 (Fla.2004) (whether omission of evidence is prejudicial is subject to de novo review). Indisputably, Reggie, Allen, and Holloway were together during the earlier altercation. Appellant was not present. Only three people were seen in the Crown Victoria at the time of the shooting. Shortly after the shooting, Reggie, Allen, and Holloway were again seen together. Appellant was again not present. This proof of the alpha and the omega suggests that the three were together in between. The fact that they “ditched” the Crown Victoria and borrowed Allen’s girlfriend’s car also would have established by inference that the three (Reggie, Allen, and Holloway) knew the police would be looking for the Crown Victoria because it had been involved in the crime.
 

 In our opinion remanding for an eviden-tiary hearing, this Court directed the trial court to consider the significance of the newly discovered evidence of Holloway. At the evidentiary hearing, Holloway explained that, after the altercation with the Biggs family, he, Reggie, and Allen went to get an assault rifle and a shotgun. According to Holloway, he took the assault rifle and was in the front passenger seat. Reggie took the shotgun and was in the
 
 *555
 
 back passenger seat. Allen was driving. Holloway testified that he and Reggie started shooting into the Biggs’s truck when they saw it at a four-way stop. After the shooting, they ditched the Crown Victoria and walked to Allen’s girlfriend’s house ten to fifteen minutes away. They then took her car and dropped the guns off with some of Allen’s “people.” Holloway said that he went along with the lie when the police told him at his arrest that they knew he was not the shooter. In response to the court’s question why it should believe him now, Holloway stated:
 

 Because. Why should he believe me? Just from the beginning he was never my buddy. And if he wasn’t innocent, I wouldn’t be here in the first place to even be trying this. He’d be telling the truth. If he would have did this, I would never came here. He’s not my friend. We never hung out or nothing. Anybody can tell you that. I’m just here trying to correct some things I did in the past that affected him and his family’s life. That’s why I’m here. His suffering.
 

 Holloway also stated that if he had to go to trial he would testify against his cousin Allen.
 

 The trial court concluded that Holloway could not be believed. To reach this conclusion, the court expressly relied upon non-record evidence, consisting of Holloway’s taped confession in which he denied that he was the shooter and implicated Appellant. On rehearing, the court acknowledged its improper reliance on this testimony, but stated that it would have reached the same conclusion without consideration of this evidence.
 
 See Branton v. State,
 
 24 So.3d 1224, 1226 (Fla. 2d DCA 2009) (‘We are not convinced that evidence from the [trial] record can be used by the postconviction court to refute [the appellant’s] postconviction claim.”). Although credibility is an issue for the trial court, we are not bound by credibility determinations that are not based on substantial, competent evidence. Here, Holloway’s testimony corroborates that of Reggie, Allen’s girlfriend, and Holloway’s jail cellmate. It is consistent with his assertion at trial that he had “never seen” Appellant. It is also consistent with the fact that the motive for the shooting was the earlier altercation, which did not involve Appellant. Moreover, the theory of defense was mistaken identity and Holloway implicated his own cousin. It defies logic that Holloway, already convicted of the crime, would implicate his relative as the third accomplice, unless his cousin was, in fact, the third accomplice and Appellant was, in fact, wrongly accused.
 

 Finally, we address the issue of the amended postconviction motion. Since we remanded this case, Trevon has now recanted his earlier testimony. During the evidentiary hearing, he testified that his earlier testimony was in error and that he was now confident that Appellant was not in the Crown Victoria that night. Although the trial court found Trevon to be “a sincere young man who cares about being truthful and doing the right thing,” it concluded that Trevon’s earlier identification was more reliable.
 

 Witness recantations are generally viewed as unreliable because they typically involve an admission of perjury.
 
 Archer v. State,
 
 934 So.2d 1187, 1196 (Fla.2006). For this reason, we are usually highly deferential to credibility determinations regarding recantations.
 
 Id.
 
 This is not a typical recantation case, however, because the witness’s testimony has been equivocal from the beginning, and the recantation only involves the accuracy of the witness’s identification. The trial judge did not conclude that the recantation was the product of perjury. To the contrary, the trial judge believed that Trevon was “a sincere young man who cares about being truthful
 
 *556
 
 and doing the right thing.” The deference that we typically afford to a trial judge’s credibility determinations is based on his or her superior position to view the demeanor of the witness.
 
 Stephens v. State,
 
 748 So.2d 1028, 1034 (Fla.1999). Here, the lower court’s assessment of the witness’s demeanor supports a finding that his recantation was truthful. The finding that his prior testimony was “more reliable,” by contrast, was based on objective circumstances, primarily the temporal connection, and we are equally capable of making that assessment based on the totality of the circumstances.
 
 See Lambrix v. State,
 
 39 So.3d 260, 272 (Fla.2010) (in evaluating recanted testimony all circumstances of case should be considered).
 

 Here, Trevon’s initial eyewitness identification was admittedly equivocal, in that he acknowledged that he could not see the face of the suspect. Further, Trevon had no motivation to be untruthful, then or now. His girlfriend was murdered and his mother was injured in the shooting. There is no evidence that he had been threatened or pressured to alter his testimony. His recanted testimony is consistent with much of the other evidence adduced at trial and in the subsequent hearing. When we consider the totality of the circumstances, we conclude that the recanted testimony is at least as reliable as that offered at trial, adding support for a new trial. Whether Appellant would be entitled to a new trial based solely on the recanted testimony is an issue we need not confront. Given the totality of the circumstances, a new trial is warranted.
 

 REVERSED AND REMANDED.
 

 GRIFFIN and COHEN, JJ., concur.
 

 [1]
 

 . In his deposition, he stated:
 

 QUESTION: Well, you told the police you couldn't really see his face, isn't that right?
 

 ANSWER: Yeah.
 

 QUESTION: And was that not true?
 

 ANSWER: That was true, yes.
 

 QUESTION: And that you couldn't really see his face?
 

 ANSWER: Yes.
 

 QUESTION: And then — when they asked you about describing his clothes, you told them it was too dark and you couldn't really see; is that right?
 

 ANSWER: I couldn't see his clothes.
 

 QUESTION: And you couldn’t see his face either, right?
 

 ANSWER: No. Not really, no.
 

 [2]
 

 . He testified at trial:
 

 ANSWER: At the time I wasn't functioning right. I was in a mode where it was just like, hey—
 

 QUESTION: We—
 

 ANSWER: I wasn’t thinking right at the time, that is why.
 

 QUESTION: I understand. But-and I understand you may have been upset, and who wouldn't be, at the time that you gave the statement to Detective Nelson. But the fact is, you gave a statement under oath?
 

 ANSWER: Yes.
 

 QUESTION: And you said, every time you were asked, "I couldn't really see anybody's face,” correct?
 

 ANSWER: Yes.
 

 [3]
 

 . In his postconviction motion, Appellant also asserted that trial counsel failed to call two of Trent's former co-workers who allegedly would have testified that Trent had a reputation for untruthfulness. The trial court summarily denied the claim because Trent had been effectively impeached at trial. We affirmed the summary disposition on that ground.
 

 [4]
 

 .
 
 Payne v. State,
 
 965 So.2d 149 (Fla. 5th DCA 2007).
 

 [5]
 

 .
 
 Payne v. State,
 
 21 So.3d 900 (Fla. 5th DCA 2009).
 

 [6]
 

 . Appellant’s trial counsel and a seasoned investigator from the Office of the Public Defender both admitted at the evidentiary hearing that they were well aware of the existence of Thomas and Barks, and had been deficient for not calling them or proffering their testimony. Although counsel's admissions are not necessarily dispositive, here, no legitimate trial strategy explains the deficiencies. The only explanation offered by counsel for not calling one of the witnesses, for example, was his fear that he would irk the trial judge by prolonging the trial.