NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

BRIAN F. HALL,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13794
Trial Court No. 3AN-14-09493 CI

O P I N I O N

No. 2821 — November 28, 2025

Appeal from the Superior Court, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD.

In 1995, Brian F. Hall was convicted, following a jury trial, of first- and second-degree murder for shooting and killing two young men, Mickey Dinsmore and

Stanley Honeycutt, following an altercation in a parking lot.[1] Hall testified in his own defense at trial, claiming that he shot the men in self-defense because he reasonably (albeit mistakenly) believed that they were armed and going to shoot him and his friends. Hall claimed specifically that a fifteen-year-old girl who was present at the scene, Monica Shelton, told him that the two men were armed. (In fact, the two men did not have a gun.) At trial, however, Shelton denied telling Hall that the two men had a gun.

Seventeen years after the trial, Shelton told a defense investigator that her trial testimony was not correct and that she actually *had* told Hall that the two men had a gun. Hall filed an untimely and successive application for post-conviction relief, arguing that Shelton's recantation constituted newly discovered evidence of innocence that showed he had acted in self-defense.

Following litigation related to the successive nature of the post-conviction relief application, the State moved to dismiss Hall's post-conviction relief application for failure to state a *prima facie* case under AS 12.72.020(b)(2), the statutory exception to the statute of limitations for otherwise untimely post-conviction relief claims based on newly discovered evidence of innocence.[2] The superior court granted the motion, ruling under AS 12.72.020(b)(2) that (1) Hall had not acted with due diligence in securing Shelton's recantation; (2) the recantation did not qualify as newly discovered evidence that was not known within eighteen months of Hall's conviction; (3) the recantation was cumulative of the evidence presented at trial; (4) the recantation was

---

[1]   Former AS 11.41.100(a) (1993) and former AS 11.41.110(a) (1993), respectively.

[2]   AS 12.72.020(b)(2) provides that a post-conviction relief claim based on newly discovered evidence may be untimely filed if (1) the applicant acted with due diligence and sets out admissible facts; (2) the new evidence was not known within eighteen months of the entry of the judgment of conviction; (3) the evidence is not cumulative; (4) the evidence is not impeachment evidence; and (5) the evidence "establishes by clear and convincing evidence that the applicant is innocent."

merely impeaching; and (5) the recantation would probably not produce an acquittal at retrial. Hall now appeals.

Whether a defendant has pleaded a *prima facie* case under AS 12.72.020(b)(2) is a question of law that we review *de novo* using our independent judgment.[3] For the reasons explained in this opinion, we conclude that the superior court erred when it ruled that Hall had not acted with due diligence in obtaining Shelton's recantation, that Shelton's recantation did not qualify as newly discovered evidence, and that the recantation was cumulative and merely impeaching.

This leaves the final requirement under AS 12.72.020(b)(2)(D) — that the newly discovered evidence "establishes by clear and convincing evidence that the applicant is innocent." We recently construed this statutory language in *Marino v. State* to require a defendant to show that it is "highly probable" that the newly discovered evidence of innocence would lead to an acquittal.[4]

For the reasons explained here, we conclude that Hall's pleadings do not meet this standard. While Shelton's recantation and her admission that she did tell Hall that the victims were armed makes Hall's subjective fear more believable, it does not alter the fact that there is significant evidence demonstrating that Hall's actions were not objectively reasonable. Accordingly, because we conclude that Hall has failed to show that it is "highly probable" that the recantation would result in an acquittal, we affirm the dismissal of Hall's post-conviction relief application.[5]

---

[3] *David v. State*, 372 P.3d 265, 269 (Alaska App. 2016); *see also James v. State*, 2023 WL 5423505, at *1 (Alaska App. Aug. 23, 2023) (unpublished summary disposition).

[4] *Marino v. State*, 577 P.3d 992, 1023 (Alaska App. 2025).

[5] *Id.*

*Relevant background facts*

We previously described the facts of Hall's underlying murder convictions in Hall's direct appeal.[6] We recount them briefly here.

Late in the evening of April 16, 1993, Brian F. Hall and his friends, Binyon Wright, Christina Thompson, Jacob Hoecker, and Dwight Wilson, drove together to a bonfire in Stuckagain Heights in Anchorage. Wright was driving. Hall was in the front passenger seat, and Thompson, Hoecker, and Wilson were in the back seat. Hall was seventeen years old, and he was carrying a loaded .44 pistol. Hall put the loaded gun under his seat.[7]

Wright parked the car in an upper parking lot above where the bonfire was being held. There, the group met a fifteen-year-old girl, Monica Shelton, who was retrieving a sweater from her friend's car. Hall called Shelton over to the car, and the two engaged in a friendly conversation. When Hall asked Shelton what her name was, Shelton said that it was "Sally." Hall responded that his name was "Trig."[8]

A few minutes later, another car came speeding into the parking lot. The car fishtailed around, stopped behind Wright's car, and began to flash its lights and honk repeatedly. Shelton walked over to the passenger side of the second car and had a conversation with the driver, Stanley Honeycutt, and the passenger, Mickey Dinsmore. The two men were in their twenties and seemed intoxicated. They stopped honking and flashing their lights when they were talking to Shelton, and Honeycutt gave Shelton a bottle of beer.[9]

---

[6] *Hall v. State*, 1998 WL 90885, at *1 (Alaska App. Mar. 4, 1998) (unpublished).

[7] *Id.* at *1-2.

[8] *Id.*

[9] *Id.* at *2.

Shelton went back to talk to Hall at Wright's car. Hall asked her if the occupants of the other car "got a problem with us." Shelton told him to "chill out" and that "we're here to have a good time." The other car began flashing its lights and honking its horn again.[10]

Shelton went back over to talk to Honeycutt and Dinsmore, who wanted to know what the occupants of Hall's car had said to her. Shelton said that they had wanted to know if there was a problem and that she had told them to chill out. According to Shelton, Dinsmore then pointed to the glove box and said, "Well, if they want to fight, we got a gun and we'll shoot them." Shelton became scared and said, "You don't want to mess with them because they look, you know, kind of like gangsters or gang members." Dinsmore responded, "If they want to fuck with us, then we got a gun and we'll shoot them."[11] (Evidence at trial showed that Dinsmore and Honeycutt did not have a gun in the glove box.)

While Shelton was talking with Dinsmore and Honeycutt, Wright got out of the car. Hall asked Wilson, who was seated behind him, to retrieve Hall's gun, which had slid from under Hall's seat to the back of the car. Hall then put the loaded gun in his back pocket and got out of the car as well.[12]

At this point, Dinsmore got out of the other car and engaged in a shouting match with Hall and Wright. There was yelling and cursing about who was going to move their car. Dinsmore was holding something indiscernible, according to Hall's testimony, and Wright pulled a metal rebar from the trunk of his car.[13]

---

[10]   *Id.*

[11]   *Id.*

[12]   *Id.*

[13]   *Id.*

Wright and Dinsmore subsequently returned to their respective cars. Dinsmore got back into the front passenger seat of Honeycutt's car. Wright got in the driver's seat of his car, putting the rebar down inside the car. Witnesses presented conflicting testimony as to whether Hall got back into Wright's car or whether he remained standing outside near the passenger door.

What happened next was the main subject of contention at Hall's trial. According to Shelton's trial testimony, she walked past Wright's car without talking to anyone and she never told Hall or anyone else in Wright's car that Honeycutt and Dinsmore had a gun. According to Hall's testimony, Shelton walked past Hall and said, "They have a gun, and they'll shoot [you], so just leave."[14]

After Shelton left the area, Honeycutt pulled his car up along the driver's side of Wright's car, stopping when his front passenger window was between the rear window and the driver's window of Wright's car. Dinsmore extended a beer bottle, bottom end first, out of the passenger window, saying, "We ain't got no beef with you; do you want some of this?"[15]

Hall testified that when Dinsmore extended his arm with the beer bottle, Hall thought that it was a gun. Hall then pulled out his gun and fired three shots. One shot struck Dinsmore on the top of the head and another struck Honeycutt in the mouth. The other occupants of Wright's car started yelling at Hall; they said, "What the fuck [did] you do that for?" and "It was a beer bottle." Hall responded, "I thought they had a gun. I never would have shot them. I thought they had a gun."[16]

Following the shooting, Honeycutt's car sped away, only to veer off the road and crash into a tree. Wright drove away with Hall, Hoecker, Thompson, and

---

[14] *Id.*

[15] *Id.* at *3.

[16] *Id.*

Wilson in the car and passed Honeycutt's crashed car without stopping. Both Honeycutt and Dinsmore died from their gunshot injuries.[17]

At trial, Wright and Thompson testified for the State. Wright testified that he was friends with Hall from school but had only known him for a few months. Wright testified that, when he got back into the car, he saw the other car pull up alongside and the passenger (Dinsmore) offer them a beer. According to Wright, Dinsmore offered them the beer in a non-threatening manner, saying something to the effect of, "You all want some of this? You know, we ain't got no problem with you all." Wright testified that, as he was responding to the offer, he saw Dinsmore get shot in the face. He heard two more gunshots in quick succession. Wright turned and saw Hall standing outside the car.

Thompson testified that she had only known Hall for a few weeks. Thompson testified that the passenger in the other car said, "We don't got no beef with you," in a "normal" tone of voice and asked if they wanted some beer, offering a bottle. According to Thompson, Hoecker declined and then asked her if she wanted the beer. Right after Hoecker asked Thompson if she wanted a beer, Thompson heard three gunshots. She saw Hall standing outside the front passenger door of Wright's car.

Hoecker testified as a defense witness.[18] He testified that he had been friends with Hall since childhood. Hoecker testified that he saw a "dark object" in Dinsmore's hand and that he slumped down in his seat because he was worried Dinsmore had a gun. On cross-examination, however, Hoecker admitted that he had previously told the police that he heard Dinsmore offer the beer and that he had declined the offer.

---

[17] *Id.*

[18] The other passenger, Wilson, did not testify at trial.

Thompson testified that, as they were driving away, Hall looked at her and said, "You're not going to say anything, are you?" She told him that she would not say anything. According to Thompson, Hall asked for something "to wipe the prints off the gun." She said that Wright stopped the car on the way home and Hall got out; he did not have the gun with him when he returned to the car. (The gun was never found.)

Later, the police obtained a warrant to record Wright's conversations with Hall, pursuant to which the police recorded conversations between Wright and Hall. In the recordings, Hall can be heard saying that the gun was "swimming in the ocean" and reminding Wright to "stick with the game plan." When Hall was interviewed by the police, he denied any involvement in the shooting.

Hall was eventually arrested and charged with two counts of first-degree murder.

*Prior trial court proceedings*

Because he was seventeen years old at the time of the shooting, Hall was originally charged in juvenile court. However, the State moved to waive him into adult court.[19] Following a waiver hearing, the superior court granted the motion. Hall was subsequently indicted on two counts of first-degree murder. Trial was held two years later, in 1995.

Prior to opening statements, the defense attorney indicated that she intended to refer in her opening statement to Shelton's alleged warning to Hall that Dinsmore and Honeycutt had a gun. The prosecutor objected, arguing that there was no

---

[19] *See* former AS 47.10.060 (1993). In 1994, the year after the shooting, the Alaska Legislature enacted former AS 47.10.010(e) (effective Sep. 1994), which required juveniles who were at least sixteen years old to be automatically waived into adult court if they were charged with certain serious crimes, including murder. Former AS 47.10.010(e) (effective Sep. 1994), *as amended by* SLA 1994, ch. 113, § 6; *see also* AS 47.12.030(a) (current auto-waiver statute).

evidentiary basis for this claim because Shelton had never said in her police interviews, at the grand jury proceeding, or at the waiver hearing that she had told Hall about a gun.

The defense attorney called her investigator, Michael Firment, outside the presence of the jury in order to make an offer of proof. Firment testified that he interviewed Shelton two times, once in 1993 and again in 1995. In the first interview, Shelton was equivocal about whether she had told Hall that the victims had a gun. In the second interview, Shelton was approached under the guise of talking about another pending criminal case involving her boyfriend. Firment testified that, in the second interview, Shelton said that she had told Hall that Honeycutt and Dinsmore had a gun or that they might have a gun. Firment testified that Shelton told him that she was scared people would think the shooting was her fault and that she had blocked a lot of it out. Firment testified that she asked if it was "too late to tell the truth." Firment told her it was not too late. According to Firment, Shelton refused his request to record the interview.

Following this offer of proof, the court permitted the defense attorney to refer in her opening statement to Shelton's alleged warning to Hall.

At trial, however, Shelton testified that she had *not* told Hall that the victims told her they had a gun. The prosecutor asked her if she had ever told a defense investigator otherwise. Shelton testified that she did not think that she told the investigator that she had warned Hall about a gun but she "may have." She criticized the investigator for approaching her under the guise of talking about her boyfriend's case. The prosecutor then asked Shelton what the truth was. Shelton testified unequivocally that she did not tell Hall about any gun.[20]

---

[20] The prosecutor's questioning was as follows:

> *Prosecutor*: As you sit here right now, what's the answer to that question? Did you tell the people in car one what the people in car two told you about having a gun?

In contrast, Hall testified at trial that Shelton *did* tell him that the victims had a gun, and he claimed that was why he believed the object in Dinsmore's hand was a gun. The defense attorney did not call Firment to testify regarding Shelton's statements to him.

During closing arguments, the prosecutor attacked Hall's self-defense theory, arguing that nothing other than Hall's self-serving trial testimony supported the defense. The prosecutor argued that this was "cold-blooded murder," asserting that the victims were unarmed, that Hall had no reason to think they were armed, and that the beer bottle was recognizably not a gun. The prosecutor characterized Hall as a manipulative liar, and he condemned Hall for having "the nerve to call Ms. Shelton a liar." The prosecutor also argued that Hall's actions in trying to get his friends to lie for him after the shooting demonstrated Hall's consciousness of guilt.

The defense attorney argued that Hall was telling the truth when he testified that he had reasonably (albeit mistakenly) thought that Dinsmore had a gun based on what Hall saw and what Shelton had told him. The defense attorney also emphasized that the State bore the burden of proving that Hall did not act in self-defense.

Following deliberations, the jury convicted Hall of first-degree murder for shooting and killing Dinsmore and second-degree murder for shooting and killing Honeycutt.[21]

At sentencing, Hall was sentenced to a composite sentence of 159 years to serve. At the sentencing hearing, the superior court agreed with the prosecutor's characterization of Hall as a manipulative, cold-blooded killer. The court found

---

*Shelton*: No, I didn't — I didn't speak to them.

[21]  Former AS 11.41.100(a) (1993) and former AS 11.41.110(a) (1993), respectively.

specifically that Shelton's testimony at trial was "highly credible" and that Hall's claim that Shelton told him that the victims had a gun was not credible.

*Hall's direct appeal and his first two post-conviction relief applications*

Hall appealed his convictions and sentence to this Court.[22] We affirmed Hall's convictions but remanded the case for reconsideration of the sentence.[23] At resentencing, the superior court imposed the same 159-year sentence.[24]

Hall subsequently filed two applications for post-conviction relief, one with the aid of counsel and one without the aid of counsel. Both applications were dismissed by the superior court, and this Court affirmed those dismissals in 2007 and 2012.[25]

*Shelton's 2012 recantation of her trial testimony*

In 2011, Hall's then-girlfriend, Angela Diaz, sent a letter to Shelton asking if she would be willing to communicate with Diaz about Hall's case. Shelton did not respond to the letter, and she later testified that the letter "spooked" her.

---

[22] *Hall*, 1998 WL 90885, at *1.

[23] *Id.* at *8.

[24] *See Hall v. State*, 1999 WL 34000714, at *1 (Alaska App. Mar. 10, 1999) (unpublished).

[25] *See Hall v. State*, 2007 WL 2069546, at *4 (Alaska App. Jul. 18, 2007) (unpublished); *Hall v. State*, 2012 WL 5897312, at *5 (Alaska App. Nov. 21, 2012) (unpublished). In both appeals to this Court, Hall argued that his trial attorney had provided ineffective assistance of counsel by failing to raise a heat of passion defense. *Hall*, 2007 WL 2069546, at *1; *Hall*, 2012 WL 5897312, at *4. Hall raised two additional claims in his second appeal (that his trial attorney had inadequately investigated his case and that the prosecutor had improperly prejudiced him by introducing certain evidence), but we concluded that these claims were waived. *Hall*, 2012 WL 5897312, at *4-5.

In 2012, Hall married Angela Diaz (now Angela Hall). Angela Hall subsequently hired a defense investigator, Andy Klamser, who contacted Shelton at her place of work in September 2012.

In a recorded interview with Klamser, Shelton said that she was nervous and that she was afraid Hall was "mad" at her. She indicated that she knew "what it's all about" and that she was "willing to put the record straight." Shelton then stated that the truth was that she did tell the occupants of Wright's car that Honeycutt and Dinsmore had a gun:

> *Shelton*: I do remember saying that to them because the guys in the car, the ones that are deceased now, did tell me that they had a gun in their glove box. They pointed at their glove box.
>
> . . . .
>
> And I was scared that there was gonna be some kind of confrontation between the two. So I did go tell the car that had Brian Hall in it. I did tell them that there was a gun. And that might've been why he thought "I'm gonna shoot first."
>
> . . . .
>
> But that's not . . . I mean that's not the way to do it. And that's not right.

Shelton said that, at the time of trial, she was "scared," and that she was "afraid [Hall] would get out of jail" if she said that she told Hall about the gun. She stated that she knew "that was lying on the stand" and acknowledged that she could "face charges" for perjury. Shelton agreed to meet the defense investigator the following day for a longer interview. However, after talking to her husband, Shelton decided not to go to the interview. Shelton's husband later told the investigator that Shelton did not want to talk to the investigator.

*Hall's third application for post-conviction relief*

Hall hired an attorney, and a year after Klamser's recorded interview with Shelton, that attorney filed an untimely motion for a new trial in Hall's closed criminal case.[26] That motion was eventually denied because it was an improper procedural vehicle in which to raise Hall's post-conviction relief claim based on newly discovered evidence.

Following that denial, Hall's post-conviction relief attorney filed an application for post-conviction relief, which was the correct procedural vehicle for raising a post-conviction relief claim based on newly discovered evidence.[27] The State moved to dismiss the application as untimely and successive because the statute of limitations had passed and Hall had already filed two previous post-conviction relief applications.[28]

The superior court dismissed the application as successive. In doing so, the court noted that there was a statutory exception, AS 12.72.020(b)(2), that could apply to otherwise untimely post-conviction relief claims based on newly discovered evidence, but that there was no similar statutory exception for successive applications raising claims of newly discovered evidence.

Hall appealed the dismissal of his post-conviction relief application to this Court, arguing that Alaska law should recognize a due process exception for successive post-conviction relief applications that were based on newly discovered evidence of

---

[26]  *See* Alaska R. Crim. P. 33(c) (requiring a motion for a new trial to be filed within 180 days of final judgment).

[27]  *See* Alaska R. Crim. P. 35.1(a)(4); AS 12.72.010-.020.

[28]  *See* AS 12.72.020(a)(3)(A) (providing that, if a conviction is appealed, the statute of limitations for filing a post-conviction relief application is one year after the decision on the appeal becomes final); AS 12.72.020(a)(6) (prohibiting successive post-conviction relief applications).

innocence.[29] We agreed that a due process exception existed for successive petitions that raised newly discovered evidence of innocence, and we held that the exception required the same showing as AS 12.72.020(b)(2).[30] We then remanded the case to the superior court to determine whether Hall was able to meet the requirements of AS 12.72.020(b)(2).[31]

On remand, the State initially moved to dismiss the application on the ground that Shelton's recorded statements to Klamser were unsworn, and Hall therefore had not shown that he had newly discovered evidence that would be admissible.

In response, Hall explained that Shelton had been unwilling to sign an affidavit. Hall requested leave to depose Shelton, but the State objected because the case was not at the discovery phase yet. Hall then requested that the court subpoena Shelton to testify in court. The court granted this request over the State's objection.

Shelton subsequently testified at a hearing before the superior court in February 2020. At the hearing, Shelton testified that her trial testimony was incorrect and the truth was that she had told Hall that the victims had a gun. She testified that at the time of Hall's trial she was "traumatized and mixed up and scared." She said that she refused to sign the affidavit the post-conviction relief attorney had prepared because the affidavit said that she had lied at trial and she did not believe that she had "outright lied." She testified that she was worried about being charged with perjury, but that she "truly believed" at the time of trial that she had not talked to Hall and that "later, as [she] thought about it, [she] did recall going back one last time and telling him [about the gun]." She testified that she "just want[ed] to come forward with the truth."

---

[29] *Hall v. State*, 446 P.3d 373, 374-75 (Alaska App. 2019).

[30] *Id.* at 378.

[31] *Id.* at 378-79.

After Shelton's testimony, the parties argued their respective positions and filed supplemental memoranda of law. Hall's post-conviction relief attorney argued that the court should deny the State's motion to dismiss because he had presented newly discovered evidence of innocence that showed that he had acted in self-defense.

The State argued that the court should grant the motion to dismiss because Hall's defense counsel was aware at the time of trial that Shelton had made contradictory statements to defense investigator Firment. According to the State, Shelton's 1995 statement to Firment was "conceptually identical" to Shelton's admissions to Klamser in the 2012 interview and this was "old news" that did not qualify as newly discovered evidence that had "not previously [been] presented and heard by the court."

The State also argued that Shelton's recantation did not establish by clear and convincing evidence that Hall was innocent, as required by AS 12.72.020(b)(2)(D). Additionally, the State argued that Hall had not demonstrated due diligence because he could have contacted Shelton earlier during his first post-conviction relief application proceedings when he was represented by counsel.

The superior court agreed with the State's arguments and issued an order dismissing Hall's post-conviction relief application. The court ruled first that Hall had failed to show due diligence in obtaining the recantation. The court also ruled that Shelton's recantation did not qualify as "newly discovered evidence" and that the recantation was cumulative to the evidence presented at trial and merely impeaching. Lastly, the court ruled that Hall had failed to show that the recantation would "probably result in an acquittal," which is the standard that applies to *timely* post-conviction relief applications raising a claim of newly discovered evidence of innocence.[32]

This appeal followed.

---

[32] *See Marino v. State*, 577 P.3d 992, 1021 (Alaska App. 2025).

*Hall's claims on appeal*

As we already explained, because Hall was raising an untimely post-conviction relief claim based on newly discovered evidence, he was required to meet the statutory requirements of AS 12.72.020(b)(2). This provision states, in pertinent part:

> (b) Notwithstanding (a)(3) and (4) of this section [the provisions setting forth the deadlines that apply to post-conviction relief applications], a court may hear a claim
>
> . . . .
>
> (2) based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and
>
>> (A) was not known within
>>
>>> (i) 18 months after entry of the judgment of conviction if the claim relates to a conviction;
>>
>> . . . .
>>
>> (B) is not cumulative to the evidence presented at trial;
>>
>> (C) is not impeachment evidence; and
>>
>> (D) establishes by clear and convincing evidence that the applicant is innocent.[33]

In *Marino v. State*, we explained that the requirements under AS 12.72.020(b)(2) are similar to the requirements imposed when newly discovered evidence underlies a timely motion for a new trial or a timely application for post-conviction relief.[34] Under *Salinas v. State*, to obtain a new trial, a defendant raising a *timely* newly discovered evidence claim must show (1) that the evidence is newly

---

[33] AS 12.72.020(b)(2).

[34] *Marino*, 577 P.3d at 1011-12.

discovered and was not available at the time of trial; (2) that the defendant has been diligent; (3) that the evidence is not "merely cumulative or impeaching"; (4) that the evidence is material; and (5) that the evidence is such "as, on a new trial, would probably produce an acquittal."[35]

For purposes of *untimely* post-conviction relief applications raising newly discovered evidence claims, however, the requirements are slightly different. Instead of showing that the newly discovered evidence was material and would "probably produce an acquittal,"[36] AS 12.72.020(b)(2)(D) requires a defendant bringing an untimely newly discovered evidence claim to show that the newly discovered evidence "establishes by clear and convincing evidence that the [defendant] is innocent." In *Marino*, we construed this statutory language to mean that the defendant must prove that it is "'highly probable' that the newly discovered evidence would result in an acquittal."[37] This "highly probable" standard requires a "much stronger showing" than does the "probably produce an acquittal" standard under *Salinas*.[38]

Thus, in the current case, to establish a *prima facie* case, Hall was required to "present the superior court with well-pleaded assertions of fact which, if ultimately proved, would be sufficient to establish his entitlement to relief" under AS 12.72.020(b)(2).[39] That is, he was required to show (1) that he exercised due diligence in presenting his newly discovered evidence; (2) that he had newly discovered evidence that was not known within eighteen months of his judgment; (3) that the newly discovered evidence was not cumulative; (4) that the evidence was not merely

---

[35] *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962).

[36] *Marino*, 577 P.3d at 1012.

[37] *Id.* at 1023.

[38] *Id.* at 1012-13, 1023.

[39] *Wyatt v. State*, 393 P.3d 442, 445 (Alaska App. 2017) (emphasis omitted).

impeaching; and (5) that it is "highly probable" that the newly discovered evidence would result in an acquittal.[40]

In determining whether Hall's pleadings were sufficient to state a *prima facie* case for relief, the superior court was obliged to view well-pleaded factual allegations in the light most favorable to Hall.[41] On appellate review, we also view Hall's well-pleaded facts in the light most favorable to Hall.[42] This includes Shelton's testimony at the 2020 court hearing. That is, at this stage in the proceedings, we are required to treat Shelton's recantation as credible, notwithstanding the State's various attacks on her credibility in its appellate briefing.[43]

Ultimately, whether a post-conviction relief application is sufficient to state a *prima facie* case for relief is a question of law that we decide *de novo*.[44] This means that we resolve the question of whether Hall established a *prima facie* case under AS 12.72.020(b)(2) using our independent judgment, without any deference to the superior court's conclusions.[45] We now turn to Hall's arguments on appeal.

---

[40]   *Marino*, 577 P.3d at 1023; AS 12.72.020(b)(2).

[41]   *See Steffensen v. State*, 837 P.2d 1123, 1125-26 (Alaska App. 1992).

[42]   *Id.*

[43]   We note that, as a general matter, courts are understandably "suspicious" of post-conviction recantations, particularly when there is a suggestion that the witness has something to gain or that the witness knows and has been influenced by friends or family of the defendant. *See, e.g., Ahvakana v. State*, 768 P.2d 631, 633 (Alaska App. 1989). Here, however, Shelton has seemingly nothing to gain by her recantation and has no connections to Hall's family and friends.

[44]   *David v. State*, 372 P.3d 265, 269 (Alaska App. 2016).

[45]   *See id.*

*Why we conclude that Hall has established a <u>prima facie</u> case of due diligence*

Alaska Statute 12.72.020(b)(2) requires a post-conviction relief applicant to demonstrate "due diligence" in presenting their otherwise untimely newly discovered evidence claim. In its order dismissing Hall's application, the superior court ruled that Hall had failed to establish a *prima facie* case of due diligence because he waited seventeen years before sending a defense investigator to interview Shelton. On appeal, Hall argues that this ruling fails to consider that "Hall had no way of knowing when, or if, [Shelton] would ever have a crisis of conscience and tell the truth." According to Hall, the fact that "it took [Shelton] 17 years to be ready to come clean about her perjured testimony is no fault of Hall's."

We agree with Hall that recantations can present particular challenges when assessing a defendant's diligence. In some instances, the defendant may actually be aware at the time of trial that the witness's trial testimony is untrue, as Hall was here; the defendant has no control over whether the witness may eventually recant their trial testimony and tell the truth.[46] As the Florida Supreme Court has recognized, "recanted testimony cannot be 'discovered' until the witness *chooses* to recant."[47] Other courts

---

[46] *See, e.g.*, *Archer v. State*, 934 So.2d 1187, 1194 (Fla. 2006) ("[A] recantation is not precluded from being considered newly discovered evidence simply because the defendant knew, as reflected by what the defendant claimed the facts to be, that the recanting witness was not telling the truth at the time of the trial or because the defendant took the stand to testify contrary to the witness.").

[47] *Davis v. State*, 26 So.3d 519, 528 (Fla. 2009); *see also Burns v. State*, 858 So.2d 1229, 1230 (Fla. Dist. App. 2003) ("Even though the appellant knew at trial that the codefendant was lying, the appellant could not have gotten the codefendant to admit that he was lying earlier, and thus the recantation is newly discovered evidence that could not have been obtained earlier with due diligence."); *People v. Molstad*, 461 N.E.2d 398, 402 (Ill. 1984) (citation omitted) (holding that affidavits of codefendants were newly discovered evidence, as "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination if the codefendants did not choose to do so").

have likewise held that a defendant's diligence in presenting a claim based on a recantation should primarily be judged from the time the defendant could reasonably have learned of the recantation.[48] Indeed, it would seemingly not be good public policy to condition a finding of diligence on a defendant's willingness to repeatedly harass a witness (or victim) for a recantation.

Here, Shelton testified that she was young (fifteen years old) at the time of the shooting and that she was very traumatized by the case. She said that she blocked out her memories of the case until at least 1998, when her mother died and she moved back to Alaska. She recalled receiving Angela Hall's letter in 2011, which she did not respond to and which "spooked" her. It was only in 2012, when contacted by Klamser, a defense investigator, that she first admitted that her trial testimony was not true. Moreover, even then, she remained reluctant to cooperate with Hall's legal team. Notably, immediately after talking to Klamser, she spoke to her husband, who convinced her she should not get involved. She then did not attend the scheduled follow-up interview with Klamser and, ultimately, Hall's attorney had to subpoena her to court in order to obtain her statements under oath.

---

[48] *See, e.g.*, *United States v. Loudner*, 203 F.upp. 2d 1083, 1094-95 (D.S.D. 2002) (finding defendant diligent because he acted within a year of learning of the witness's recantation); *State v. Scott*, 207 P.3d 495, 501 (Wash. App. 2009) (concluding that defendant acted with diligence in discovering recantation by the alleged victim and two witnesses because defendant was imprisoned, subject to a no-contact order with regard to the victim, and it was "unlikely the[] witnesses would have changed their stories earlier" or that the defendant could have influenced them to do so); *People v. Morgan*, 817 N.E.2d 524, 527-28 (Ill. 2004) (noting that recantation of eyewitness's trial testimony seventeen years after defendant's conviction was "newly discovered" where it "was not available at defendant's original trial and . . . the defendant could not have discovered it sooner through diligence"); *Cammarano v. State*, 602 So.2d 1369, 1370 (Fla. App. 1992) (noting that an untimely application is permissible if recantation could not have been reasonably discovered prior to filing of first post-conviction relief application); *see also People v. Wideman*, 52 N.E.3d 531, 543-44 (Ill. App. 2016) (emphasizing that defendant must provide specific well-pleaded assertions regarding why an affidavit could not reasonably have been discovered sooner and affirming dismissal of application where defendant offered only conclusory general assertions regarding diligence).

2821

Viewing these facts in the light most favorable to Hall, the record strongly suggests that earlier attempts to contact Shelton either were or would have been unsuccessful and that 2012 was the earliest that Shelton was willing to come forward with a recantation.[49] Accordingly, even if Hall had done more to contact Shelton other than send the 2011 letter, it is unlikely that additional efforts would have made any difference.[50]

On appeal, the State notes that Hall did not file this post-conviction relief application until two years after the 2012 recantation. The State asserts that this two-year delay reflects a lack of diligence. But a review of the record shows that at least six months of that time was spent litigating the procedurally improper motion for a new trial that Hall's post-conviction relief attorney initially filed. There is little question that it was incompetent for Hall's post-conviction relief lawyer to file a motion for a new trial rather than an application for post-conviction relief.[51]

Moreover, the filing of the new trial motion provided notice to the State regarding the recantation. The State was therefore aware of the underlying substance of Hall's newly discovered evidence claim within twelve months of Shelton's recantation

---

[49] In his pleadings, Hall asserted that one of his prior attorneys had previously attempted to contact Shelton at her workplace, but Shelton was unwilling to talk to the attorney. However, Hall failed to provide an affidavit from that attorney supporting this assertion.

[50] *See, e.g.*, *Davis v. State*, 26 So.3d 519, 528 (Fla. 2009) ("Logically, even if counsel had or could have located these witnesses at an earlier date such earlier date does not conclusively establish that the witnesses would have recanted their testimony at that earlier time.").

[51] *See* Alaska R. Crim. P. 33(c) (providing that a motion for a new trial based on newly discovered evidence must be filed within 180 days of the final judgment); Alaska R. Crim. P. 35.1(a)(4) (authorizing the filing of a post-conviction relief action for claims related to new evidence of material facts not previously heard).

— even though it would take another eleven months before the post-conviction relief attorney's mistake was corrected and the right procedural vehicle was filed.[52]

Given these circumstances, we conclude that Hall established a *prima facie* case that he acted with due diligence in response to the 2012 recantation.

*Why we conclude that Shelton's recantation qualifies as newly discovered evidence that was not known within eighteen months of the criminal judgment*

Alaska Statute 12.72.020(b)(2)(A)(i) provides that new evidence must not have been known "within 18 months after entry of the judgment of conviction if the claim relates to a conviction." In its order, the superior court ruled that Shelton's recantation did not meet this requirement because Hall and his attorneys were aware, at the time of trial, that Shelton had previously admitted to defense investigator Firment that she told Hall about the alleged gun.

But, as Hall argues on appeal, this ruling fails to recognize what "newly discovered evidence" is at issue in this case. What is "new" is not the fact that Shelton made contradictory statements to Firment about whether she told Hall about the gun, but rather her recantation and sworn statements that "the truth" is that she *did* tell Hall about the alleged gun. At trial, Shelton testified that she did *not* tell Hall about the gun, although she also acknowledged telling Firment that she "might" or "may have" made such a statement because she could not remember. Asked in court to clarify, she adamantly denied that she had said anything about a gun to Hall. Calling Firment as a witness to Shelton's unsworn, unrecorded admission and/or further cross-examining Shelton about her past admission would not have provided Hall with what he has now: sworn testimony from Shelton that what she said at trial was not true and that the truth

---

[52] *Cf. Alex v. State*, 210 P.3d 1225, 1228-29 (Alaska App. 2009) (recognizing that equitable tolling may apply when defendant pursues their claim through the wrong procedural vehicle).

is that she *did* tell the occupants of Wright's car — including Hall — that Dinsmore and Honeycutt had a gun.

We accordingly conclude that Shelton's recantation qualifies as newly discovered evidence that was not "discovered," for purposes of Hall's post-conviction relief claims, until 2012.

*Why we conclude that Shelton's recantation is not cumulative of the testimony presented at trial and not merely impeaching*

Alaska Statute 12.72.020(b)(2)(B)-(C) states that newly discovered evidence must not be "cumulative to the evidence presented at trial" and must not be "impeachment evidence." In *Mooney v. State*, we explained that the prohibition against mere "impeachment" evidence is a prohibition against evidence "that is cumulative of the evidence previously available, or that simply reinforces the evidence that was previously available to impeach the government's case."[53] If the newly discovered evidence impeaches the government's case "in new and significant ways," then it is not considered "merely impeaching" for purposes of either the *Salinas* test or AS 12.72.020(b)(2).[54]

Here, the superior court ruled that Shelton's recantation was cumulative of the evidence presented at trial because (1) Shelton admitted at trial that she may have told a defense investigator that she told Hall about the alleged gun; and (2) Hall himself testified that Shelton told him that Honeycutt and Dinsmore had a gun. The superior court also ruled that the recantation was "merely impeaching."

But these rulings overlook the fact that, although Shelton admitted that she may have said something different to the defense investigator, she was otherwise unequivocal in her trial testimony that the truth was that she did *not* tell Hall that

---

[53] *Mooney v. State*, 167 P.3d 81, 83 (Alaska App. 2007).

[54] *Id.* at 91 (citing *Salinas v. State*, 373 P.2d 512 (Alaska 1962)).

Dinsmore had a gun. The superior court's rulings also ignore the centrality of Shelton's testimony to the State's theory of the case and the prosecutor's depiction of Hall as a cold-blooded and manipulative killer who was lying about what had occurred.

During closing argument, the prosecutor emphasized Shelton's status as a neutral witness who had no preexisting relationship with any of the others present:

> *Prosecutor*: You heard, of course, from Monica Shelton. I submit to you that of all the people that we put on, the non-police witnesses, the non — the witnesses who were civilian witnesses, people who were present at the crime scene, Monica Shelton is a witness whose testimony you should rely upon above all others. Why do I say that? First of all, Monica Shelton is the one witness with no preexisting relationship between any of these people. She didn't know them. She didn't know them before this happened.

The prosecutor asserted that Shelton was telling the truth about what had happened and that Hall was lying about what had occurred:

> *Prosecutor*: And it's at this point where Mr. Dinsmore — or where she tells them, you better not — you know, you shouldn't be messing with those guys. And Mr. Dinsmore says, well, we got a gun in here. There's no evidence — no evidence, no reliable evidence, other than Mr. Hall's own words, that that was ever passed from Ms. Shelton to Mr. Hall. No evidence other than Mr. Hall's own testimony. Shelton swears, subject to cross-examination, that at that point where she sees Mr. Wright and Hall get out of the car, she decides, go. And she's very definite about where she went. . . . And she swears, I never told anybody in the Wright-Hall vehicle, in the Trig vehicle, what Mr. Dinsmore said.

The prosecutor disparaged the defense investigator who interviewed Shelton and obtained her prior inconsistent statement, telling the jury they should be "outraged" by the defense investigator's tactics:

> *Prosecutor*: In nine — June of 1995, a defense investigator, posing — or using as a pretext, I guess would probably be a better word — that he's working on her

boyfriend's case, knocks on her door: Let me talk to you about your boyfriend's case. That's not really what's going on. He wants to talk to her about this case. Well, there's a dispassionate inquiry for the truth; a defense investigator in June of '95, more than two years after this happened, after this witness has been questioned on this point, answered this question, shows up at the door: Let me talk to you about your boyfriend's case. And then switches the conversation, doesn't let her look at her statements. You should be outraged by that, be outraged. Monica Shelton took the stand and told you what happened. She's very definite about where she was and what she said. I urge you to rely on her statement.

The prosecutor ultimately ended his closing argument by characterizing Hall as a manipulative, cold-blooded killer who "had the nerve to call Ms. Shelton a liar." He argued:

> *Prosecutor*: [Hall] offered you this story about Monica Shelton passing the gun statement, Dinsmore's gun statement — is that a surprise? He sat in court and he's heard her tell that story before. Then during this trial, he sat in court and listened to her tell that story again. Is it any surprise to you that he takes the stand and twists the story to his advantage, and on his word, asks you to believe him? Is that a surprise? It didn't happen. Mr. Hall is lying. . . . This isn't a self-defense case; this is cold blooded murder, people. You should find him guilty as charged.

As these portions of the prosecutor's closing argument demonstrate, Shelton's trial testimony was central to the prosecutor's argument for why the jury should convict Hall of first-degree murder for intentionally killing Dinsmore and Honeycutt. The closing arguments would have looked very different if Shelton had admitted what she now asserts is the truth: that she *did* tell Hall about Dinsmore's comments about having a gun.

Thus, contrary to the superior court's ruling, Shelton's recantation is not simply cumulative of the evidence presented at trial, and it is not "merely impeaching."

Instead, the recantation is evidence that undermines the State's case in a new and significant way.

*Why we conclude that Hall's pleadings, even when viewed in the light most favorable to Hall, do not establish a prima facie case that it is "highly probable" that Shelton's recantation would result in an acquittal at a retrial*

We now turn to the final requirement of AS 12.72.020(b)(2), which requires the defendant to show that the new evidence "establishes by clear and convincing evidence that [the defendant] is innocent."[55] As we already explained, we recently interpreted this language in *Marino v. State* to require the defendant to show that it is "highly probable" — *i.e.*, more than just "probable" — that the newly discovered evidence would result in an acquittal when considered with the totality of evidence known to both parties.[56] As we emphasized in *Marino*, this is a high standard to meet.[57] Indeed, it is higher than the *Salinas* "probably produce an acquittal" standard used for timely newly discovered evidence claims, which the superior court ruled was not met here.[58]

In order to understand why Hall's pleadings do not meet this standard, we must first explain the dual nature of a self-defense claim. There is both a subjective and an objective component to a self-defense claim.[59] In order to justify the use of deadly force, a defendant must have "actually believed that deadly force was necessary to protect himself," and that belief "must be one that a reasonable person would have held

---

[55]   AS 12.72.020(b)(2)(D).

[56]   *Marino v. State*, 577 P.3d 992, 1023 (Alaska App. 2025).

[57]   *Id.* at 1021.

[58]   *Id.* (quoting *Salinas*, 373 P.3d at 515).

[59]   *See* AS 11.35.330-340.

under the circumstances."[60] Thus, to raise a viable claim of self-defense at trial, Hall was required to put forward evidence (1) that he subjectively believed that deadly force was necessary to protect himself and/or his friends; *and* (2) that this subjective belief was objectively reasonable based on the circumstances known to Hall at the time the deadly force was used.[61]

There is no question that Shelton's recantation supports the first prong of Hall's self-defense claim. At trial, Hall testified that he shot Honeycutt and Dinsmore because he subjectively believed that the beer bottle that Dinsmore was extending was actually a gun and that Dinsmore was about to shoot Hall and/or his friends. Hall explained that he believed that Dinsmore had a gun primarily because Shelton had just told him that "[Honeycutt and Dinsmore] have a gun, and they'll shoot [you], so just leave." Hall was impeached at trial with Shelton's trial testimony, in which she swore that she had *not* told Hall about Dinsmore's comment about having a gun. And, as we already explained, the prosecutor used Shelton's trial testimony to argue that Hall was lying about being subjectively afraid and that the truth was that Hall was a cold-blooded killer who had murdered Dinsmore and Honeycutt without any provocation.

Shelton's recantation makes Hall's original trial testimony more credible and his mistake in thinking the beer bottle was a gun more believable. As the only person who heard Shelton's comment about the gun, Hall was particularly primed to misinterpret the situation.

That said, the problem that Hall still faces, notwithstanding Shelton's recantation, is that the rest of the evidence from trial indicates that Hall's mistaken belief that he had to use deadly force against Honeycutt and Dinsmore was not objectively reasonable. As the superior court noted in its order, "the 'altercation' was

---

[60]   *Weston v. State*, 682 P.2d 1119, 1121 (Alaska 1984).

[61]   *Id.*

seemingly over" by the time Honeycutt's car pulled up alongside Wright's car. Wright (the driver) and Thompson (one of the backseat passengers) both testified that they saw the two men in the other car and heard Dinsmore offer a beer and extend the beer bottle. Wright and Thompson testified that Dinsmore's tone was calm and non-threatening. Thompson also testified that Dinsmore was holding a beer bottle by the neck, with the round bottom extended, and that the beer bottle was clearly recognizable as a beer bottle.

Moreover, as the superior court ruled, the testimony showed that "there was ample time for Hall to realize that deadly use of force was not necessary to avoid death or serious injury." Thompson testified that backseat passenger Hoecker answered "no" to Dinsmore's offer of a beer and there was time for Hoecker to ask Thompson if she wanted the beer prior to Thompson hearing any gunshots.

It is true that Hoecker, who was a childhood friend of Hall's, testified that he saw Dinsmore with a "dark object" and that he slumped down in his seat because he was worried the object might be a gun. But Hoecker was impeached at trial not only by Thompson's contrary testimony but also by Hoecker's prior statements to the police in which he admitted that he had declined Dinsmore's offer of a beer.

Ultimately, to establish a *prima facie* case for relief, Hall was required to show that, viewing all the well-pleaded facts in the light most favorable to Hall, it is "highly probable" that Shelton's recantation would result in an acquittal at any retrial. But while Shelton's recantation constitutes important new evidence that sheds more light on Hall's motivations and the reasons for his subjective fear, it does not alter the fact that his actions in shooting both men still appear overly impulsive and objectively unreasonable under the circumstances.

At trial, it was the State's burden to prove beyond a reasonable doubt that Hall did not act in self-defense.[62] Now, thirty years later, it is Hall's burden to show that

---

[62] *Jones-Nelson v. State*, 512 P.3d 665, 672 (Alaska 2022).

it is "highly probable" that the jury would acquit him in light of Shelton's recantation. Having carefully reviewed Hall's post-conviction pleadings and the original trial, we conclude that Hall has failed to meet this burden, even viewing Shelton's recantation in the light most favorable to Hall, as we are required to do at this stage of the proceedings.

We note, however, that this does not mean that Shelton's recantation will have no effect on Hall's future prospects. Both at trial and at sentencing, Hall was depicted as a manipulative, cold-blooded killer who had the audacity to claim that Shelton was lying about what she told Hall. Indeed, at sentencing, the superior court specifically found that Shelton's trial testimony was credible and that Hall's account of what had been said was not credible. Knowing now that Shelton apparently *did* tell Hall about the (nonexistent) gun makes Hall's fear more believable and his actions more understandable than they appeared at the time to either the prosecutor or the superior court.

At sentencing, the court sentenced Hall to 159 years to serve, one of the highest sentences — if not the highest sentence — that a juvenile tried as an adult in Alaska has ever received. As a juvenile sentenced in 1995 to a *de facto* life without parole sentence, Hall has been granted the opportunity for a resentencing in which his youth and the unique attributes of youth will be appropriately considered.[63] As part of

---

[63] *See Fletcher v. State*, 532 P.3d 286, 308 (Alaska App. 2023); *see also Miller v. Alabama*, 567 U.S. 460, 471 (2012) (holding that "children are constitutionally different from adults for purposes of criminal sentencing").

In *Miller*, the United States Supreme Court noted "three significant gaps between juveniles and adults" that warranted differential treatment at sentencing:

> First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable … to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

that resentencing, the court should take into account Shelton's recantation and the effect of that recantation on Hall's level of culpability.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

*Miller*, 567 U.S. at 471 (alterations in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005)).